Case 17-23339-GLT    Doc 206    Filed 09/10/18    Entered 09/10/18 16:33:10    Desc Main
Document    Page 1 of 29

FILED
9/10/18 4:29 pm
CLERK
U.S. BANKRUPTCY
COURT - WDPA

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re: | : | Case No. 17-23339-GLT |
| | : | Chapter 11 |
| **PINNACLE LAND GROUP, LLC,** | : | |
| | : | |
| *Debtor.* | : | |
| | : | |
| **WILMINGTON TRUST, NATIONAL ASSOCIATION, AS TRUSTEE FOR THE REGISTERED HOLDERS OF B2R MORTGAGE TRUST 2015-2 MORTGAGE PASS THROUGH CERTIFICATES,**[1] | : : : : : | |
| *Movant,* | : | Related to Dkt. Nos. 52, 75 |
| | : | |
| v. | : | |
| | : | |
| **PINNACLE LAND GROUP, LLC,** | : | |
| | : | |
| *Respondent.* | : | |

Gloria R. Buckley, Esq.                     Donald R. Calaiaro, Esq.
Robert L. Grundlock, Jr., Esq.              Calaiaro Valencik
Rubin, Ehrlich & Buckley, P.C.              Pittsburgh, PA
Lawrenceville, NJ                           Attorney for the Respondent
Attorney for the Movant

## MEMORANDUM OPINION

Pinnacle Land Group, LLC ("Pinnacle") obtained a loan from Wilmington's predecessor, pledging its assets as collateral, but Wilmington now believes it was hoodwinked. It claims that Pinnacle was created to obscure the true owners of the real estate assets, Michael Staaf ("Staaf") and his mother, Joann Jenkins ("Jenkins"), by temporarily transferring their interests to an entity controlled by a third-party, Michelle Person ("Person"), in order to obtain financing for a maturing loan. Wilmington now seeks dismissal of Pinnacle's bankruptcy case

---

[1]     The movant is hereinafter referred to as "Wilmington."

or, alternatively, stay relief to reinstate a state court-appointed receiver and continue mortgage foreclosure proceedings.[2] Pinnacle opposes such relief by offering a plan of reorganization that would validate the equity held by Staaf and Jenkins while substantially modifying Wilmington's claim. After conducting an evidentiary hearing, the Court concludes that Pinnacle's chapter 11 case does not serve a valid reorganizational purpose. Rather, the case exists solely to sanctify a ruse perpetuated on the lender, if not advance it. Because the apparatus of the bankruptcy system cannot be used for such nefarious purposes, the case will be dismissed with prejudice.

## I.    BACKGROUND

### A.    Factual History

For over 20 years, Staaf managed an eclectic portfolio of over 400 rental units through his management company, 2M Management Group, LLC ("2M").[3] He also acted as a mortgage and real estate broker.[4] In 2012, Staaf began serving four years in a federal correctional institution after pleading guilty to charges of conspiracy to commit bank fraud and money laundering arising from his mortgage brokerage business.[5] Before entering prison, Staaf transferred interests in his existing real estate businesses to his mother (Joann Jenkins), father (Werner Staaf), and his ex-wife (Amy Staaf).[6] Jenkins held title to her respective properties either in her own name or through her affiliates, Pro Equity, LLC and EON Properties, LLC.[7]

---

[2]    See *Motion on Behalf of Wilmington Trust for Relief from Automatic Stay, Alternatively, Awarding Adequate Protection Payments* [Dkt. No. 52] (the "Motion for Stay Relief"); *Motion on Behalf of Wilmington Trust for Dismissal of Debtor's Petition* [Dkt. No. 75] (the "Motion to Dismiss").

[3]    Transcript of March 21, 2018 Hearing, Dkt. No. 167 ("Vol. 1 Trans.") at 144:3–18, 146:7–12.

[4]    Vol. 1 Trans. at 144:1–2; Transcript of April 4, 2018 Hearing, Dkt. No. 169 ("Vol. 2 Trans.") at 6:19–25.

[5]    Vol. 1 Trans. at 144–45; Vol. 2 Trans. at 7–9. As a result of his felony conviction, Staaf surrendered his licenses as both a mortgage and real estate broker. Vol. 1 Trans. at 144:19–22; Vol. 2 Trans. at 9:18–24.

[6]    Vol. 2 Trans. at 10:2–19, 11:14–20.

[7]    Vol. 1 Trans. at 145:17–25,146:1–6; Vol. 2 Trans. at 65–66.

Jenkins encountered "a lot of problems" managing her real estate holdings in Staaf's absence.[8] Staaf recommended Neil Metzger ("Metzger"), an individual he met in prison, to Jenkins as someone who could assist with the business.[9] During the nine months they served together, Staaf found Metzger to be "very organized" and "trustworthy."[10] Jenkins was similarly "impressed" with Metzger and agreed to have him run the operations until Staaf was released.[11]

By 2014, Jenkins was in need of financing. Delinquent real estate tax obligations had accrued on her properties and a balloon payment was about to come due under an existing loan.[12] Jenkins was seemingly unable to obtain a loan in her own name,[13] so Julian Hickman ("Hickman") and his business partner, Person, were enlisted to procure a loan that would refinance her existing secured debt.[14] Hickman is not a mortgage broker, but he has connections to real estate brokers and experience in structuring real estate transactions.[15] Person works as an elementary school principal in Cleveland, and together she and Hickman share ownership of several real estate investment companies.[16]

---

[8]    Vol. 1 Trans. at 146:22–25; Vol. 2 at 68:6–13.

[9]    Vol. 1 Trans. at 146:13–16.

[10]    Vol 1 Trans. 146:17–22; 147:1–2; Vol. 2 at 94:8–12.

[11]    Vol. 2 Trans. at 68:13–24, 94:11–21.

[12]    Vol. 1 Trans. at 147:7–16.

[13]    The Court infers that Jenkins could not obtain financing on her own based on the final structure of the transaction and the lack of any explanation for it. Staaf testified that Jenkins should have been able to get a loan, alleging that she had "excellent credit and an extremely good asset base." Vol. 2 Trans. 24:4–15. For her part, Jenkins testified that she "never even thought about" obtaining a loan in her own name. Vol. 2 Trans. at 68:25, 69:1–7. The Court further infers that Staaf's criminal background and prison sentence would have negatively impacted his ability to obtain the necessary refinancing.

[14]    Vol. 2 Trans. at 44:4–6.

[15]    Vol. 2 Trans. at 44:7–15.

[16]    Vol. 2 Trans. at 34:11–25, 35:1–11. Hickman and Person also share a daughter. Id.

3

How exactly Hickman and Person became involved in the transaction is unclear. Jenkins did not know Hickman or Person, and never met them until years later.[17] Person testified that Hickman "knew Mike,"[18] though Staaf insisted that he did not meet "Julian or Michelle *in person*, until after [he] had come home, which was several years after the loan had taken place."[19] Jenkins testified that Metzger "mentioned" Person to her,[20] but that does not establish that Metzger was the introductory connection. Though the Court need not resolve this issue, the testimonial inconsistencies are notable and bear on the credibility of the witnesses.

Hickman ultimately devised a plan to transfer Jenkins' properties to a newly-formed entity that would function as the borrower with Person serving as the borrower's principal and guarantor.[21] But Person and Jenkins each deny knowledge of certain critical details of the transaction. Person testified that she neither knew, nor asked, why Jenkins was not signing the loan herself, but agreed to do so as an "accommodation" to Hickman.[22] Moreover, she insisted that the transaction was mostly handled by others and that she was only "vaguely" involved to the extent that she signed the documents.[23] Person acknowledged, however, that she was the designated principal for the real estate transactions because she has better credit than Hickman.[24] This suggests that Person was specifically chosen because she projected to be the most qualified borrower among other available options. For her part, Jenkins was not involved

---

[17]    Vol. 2 Trans. at 71:10–18.

[18]    Vol. 2 Trans. at 34:24–25.

[19]    Vol. 1 Trans. at 147:19–25 (emphasis added). The Court questions the degree of emphasis Staaf intended when he answered that he never met them "in person" until after the refinancing.

[20]    Vol. 2 Trans. at 68:25, 69:1–4.

[21]    Vol. 2 Trans. at 44:16–17.

[22]    Vol. 2 Trans. at 44:18–23, 51:15–19.

[23]    Vol. 2 Trans. at 35:12–17.

[24]    Vol. 2 Trans. at 47:11–14.

in the transaction aside from signing some documents Metzger handed her, and never received

any of the loan documents or money after the closing.[25]  Although potentially unaware of each

detail of the transaction, Jenkins repeatedly testified that she understood that the properties were

being transferred to Person so that money could be borrowed against them, and that once the

financing was complete, Person would return control of the properties to her.[26]

The plan's initial phase began in autumn 2014.  Jenkins and her affiliates, Pro

Equity and EON Properties, conveyed four properties to ABCD Development & Consulting,

LLC, an entity owned by Hickman and Person.[27]  Despite the consideration stated on each of the

deeds, the parties agree that no money actually changed hands during the transfers.[28]

The second phase involved the creation of the new borrower entity—Pinnacle

Land Group.  To that end, Person formed "Pinnacle Land Group, LLC," a Delaware limited

liability company authorized to conduct business in Pennsylvania, in November 2014 ("DE-

Pinnacle").[29]  At the time of its formation, Person held 100% of the membership interests in DE-

Pinnacle and was its sole manager.[30]

Curiously, there is another similarly named entity whose mere existence has sown

confusion in this case.  "Pinnacle Land Group LLC," is a Pennsylvania limited liability company

formed on or before April 11, 2014 ("PA-Pinnacle"), approximately four months prior to the

---

[25]     Vol. 2 Trans. at 69:8–22, 71:22–25, 72:1–5.

[26]     Vol. 2 Trans. at 70:3–13, 71:19–21, 86:1–13, 91:1–14, 94:22–25, 95:1–22.  The agreement was not reduced to a writing.  Vol. 2 Trans. at 52:24–25, 53:1–2, 94:22–25, 95:1–8.

[27]     See Ex. P.  Two of the deeds were executed by Evonne Herman as the managing member of Eon Properties, though both Staaf and Jenkins insist that Herman was merely Jenkins' secretary, and not a managing member of Eon Properties with such authority.  Vol. 1 Trans. 155:4–13, 162:14–22; Vol. 2 Trans. 67–68, 89–90.  Staaf also testified that Herman was terminated by Metzger shortly after the refinancing closed.  Vol. 1 Trans. at 162:23–25, 163:1–2.

[28]     Vol. 1 Trans. at 157, 162, 165, 167, 169; Vol. 2 Trans. at 35:3–11, 37:1–10, 84.

[29]     Exs. 9–10, 12.

[30]     Ex. 12.

5

initial property transfers to ABCD Development.[31]  Although Staaf denies any knowledge of or involvement in establishing PA-Pinnacle, the information submitted to the Pennsylvania Department of Revenue identifies him as its owner and his personal information (including social security number, date of birth, and home address) was used to substantiate its registration with the state.[32]  In addition to having different domiciles and members, PA-Pinnacle and DE-Pinnacle also have different tax identification numbers[33] and are distinctly punctuated.[34]  It does not appear that PA-Pinnacle has ever operated or has any assets.[35]

With DE-Pinnacle in place, Hickman prepared deeds to transfer the real estate assets.[36]  On June 15, 2015, DE-Pinnacle obtained title to the four properties previously transferred to ABCD Development, as well as an additional property from Pro Equity.[37]  Two weeks later, Amy Staaf conveyed two of her properties to DE-Pinnacle.[38]  A final property was transferred on July 6, 2015 from Melmic, LLC, a company owned by Amy Staaf.[39]  In all, DE-Pinnacle received title to eight parcels of real property located in Allegheny and Beaver

---

[31]    Exs. 33, 11.

[32]    Ex. 33; see also Vol. 1 Trans. at 143:23, 175:14–24 ("The only problem is I was incarcerated at this time, so I did not form that, even though all my information is there.").

[33]    The parties stipulate that the final four digits of PA-Pinnacle's federal employer identification number are 6170, while the final four digits of DE-Pinnacle's are 0157. Vol. 1 Trans. at 53:10–25.

[34]    DE-Pinnacle uses a comma after the word "Group," while PA-Pinnacle does not.

[35]    Vol. 1 Trans. at 175:16–19.

[36]    Vol. 2 Trans. at 36:4–8.

[37]    Ex. 16.

[38]    Id.

[39]    Vol. 1 Trans. 165:1–23; Ex. 16. Inexplicably, the deeds from Pro Equity and Melmic, LLC directly to DE-Pinnacle were executed by Person as "Sole Member and Sole Manager," though all parties agree she was neither. Ex. 16 at WT 226–29, 231–34; Vol. 1 Trans. at 168:12–13, 171:1–4; Vol. 2 Trans. at 35:18–25, 36:1–3, 66:12–14, 85:10–16.

Counties.  Notably, all of the properties transferred to DE-Pinnacle were at one time purchased by Staaf or one of his companies.[40]

During the course of his incarceration, Staaf was aware that Jenkins was pursuing a much needed refinancing with the assistance of Hickman.[41]  Nevertheless, he testified that he was surprised to learn that the plan required her to transfer the properties out of her name.[42]  Indeed, when Jenkins informed him, Staaf "told her to stop" and "called the office to yell at Neil Metzger about it."[43]  The next day, Staaf suggests Metzger attempted to silence him by falsely reporting Staaf's use of a cellphone to the prison, resulting in the revocation of Staaf's phone and email privileges and a delay in his release date.[44]  It is unclear when this incident purportedly occurred.  Staaf was due to come home in four months, yet the transfers occurred over a span of ten months.[45]  Conspicuously, Jenkins did not mention Staaf's warning or otherwise offer any corroborating testimony.

The final phase of the plan called for third-party financing.  On June 30, 2015, B2R Finance L.P. provided a $535,000 loan to DE-Pinnacle that was secured by mortgage liens on all eight properties.[46]  Person executed the loan documents on behalf of DE-Pinnacle as its "sole member and manager."[47]  Person also delivered a personal guaranty of all obligations owed

---

[40]    Vol. 1 Trans. at 145:14–19.

[41]    Vol. 1 Trans. at 147:7–18.

[42]    Vol. 1 Trans. at 188:2–8.

[43]    Vol. 1 Trans. at 188:10–13.

[44]    Vol. 1 Trans. at 188:13–24.  Staaf subsequently discovered that Metzger was behind the false report during a deposition of an unidentified former secretary in an unrelated litigation. Id. at 189:1–9.

[45]    Vol. 1 Trans. at 188:10.

[46]    Exs. 1, 3, 5, 8.

[47]    Exs. 1, 3, 5, 7, 8; see also Vol. 1 Trans. at 22:11–15; Vol. 2 Trans. at 50:16–18, 51:2–3.

under the loan documents.[48]  B2R subsequently assigned its interests in the loan to Wilmington

in November 2015.[49]

It is clear that Person played a determinative part in B2R's decision to fund the

loan.  During its due diligence process, B2R evaluated and assessed Person's background.  It

performed a credit check,[50] analyzed past and pending litigation against her,[51] and it scrutinized

her financial information.  Among other things, B2R tested Person's net worth and liquidity to

assess her ability to personally support up to six months of debt service payments on the

underlying loan.[52]  Upon making a determination to fund the loan, it appears that B2R relied

heavily upon Person's knowledge and involvement, including her "years of real estate

experience as an investor, consultant, and Realtor," as well as her ownership of more than "50

investment rental properties."[53]  Person's importance to B2R is further evidenced by the loan's

restriction on the transfer of the borrower's ownership without prior lender consent.[54]

B2R also examined the skillset and experience of 2M, the proposed property

manager for the mortgaged properties.  Although Staaf testified that he is the owner of 2M, B2R

understood that 2M was wholly owned by Person.[55]  This information appears to have derived, in

---

[48]     Ex. 7; see also Vol. 2 Trans. at 47:15–24.

[49]     Exs. 2, 4, 6; see also Vol. Trans. at 37:12-17, 56:8-13.

[50]     Ex. 17 at WT 0238.

[51]     Vol. 1 Trans. at 33:6–8.  Following the real estate downturn in 2009, B2R concluded that "Michelle Person
         showed reestablished credit in her credit payments, FICO score, and reestablished assets and liquidity." Id.
         at 33:10–12.

[52]     Vol. 1 Trans. at 32:20–25; see also Ex. 17 at WT 0237 (noting Person's "reported net worth is more than
         $3.2MM (nearly 6x the proposed loan amount) and verified liquidity is sufficient to support 12 months of
         debt service payments.").

[53]     Ex. 17 at WT 0237; see Vol. 1 Trans. at 33:15–19.

[54]     Vol. 1 Trans. at 77:6–12.

[55]     Ex. 17 at WT 0239 ("The property management company, which is 100% owned by the Guarantor, has
         over 12 years of experience and currently manages 76 properties.").

part, from a questionnaire completed by 2M which merely identified Staaf as a "Realtor" and suggested that the rest of the management staff consisted of "Evonne" and "Ruth Ann" who served as operations manager and office manager, respectively.[56]

After the financing was complete, Metzger was tasked with the day-to-day management of DE-Pinnacle's properties.[57]  The arrangement lasted approximately a year.  As the months went by, Jenkins claims she became "suspicious ... of the way things were going."[58] She "felt that there was some hanky panky going on with the company"[59] because Metzger (allegedly) failed to provide her with monthly financial statements, was transferring funds from 2M's Pennsylvania bank accounts into an account in Virginia, and was generally evasive regarding 2M's income.[60]  Believing that Metzger was "completely destroying the companies"[61] and "going to steal the properties,"[62] Jenkins resolved to terminate him.[63]  Before she could do so, however, Metzger resigned.[64]  At trial, Person offered no additional details, suggesting only that Metzger "kind of imploded."[65]

Following Metzger's departure, Staaf and Jenkins claim that all of their business records and a computer server were stolen.[66]  Jenkins testified that Metzger told her about the

---

[56]     Ex. N; see also Vol. 1 Trans. at 50:14–16 (acknowledging that B2R knew that Staaf and 2M were working with Person at the time the loan closed).

[57]     Vol. 2 Trans. at 36:17–22.

[58]     Vol. 2 Trans. at 88:4–6.

[59]     Vol. 2 Trans. at 86:22–23.

[60]     Vol. 2 Trans. at 70:16–25, 86:17–24.

[61]     Vol. 2 Trans. at 88:10.

[62]     Vol. 2 Trans. at 88:1–3.

[63]     Vol. 2 Trans. at 86:21–23, 88:1–3.

[64]     Vol. 2 Trans. at 86:24.

[65]     Vol. 2 Trans. at 39:25.

[66]     Vol. 1 Trans. at 186–87; Vol. 2 Trans. at 86:25, 87:1–6.

theft before leaving.[67]  She further testified that the hard copies of all the corporate records for all

of her businesses were similarly stolen from her storage facility.[68]  Both suggest that Metzger is

the likely perpetrator, though Staaf concedes that he cannot prove it and is ultimately unaware of

who might be responsible.[69]  Moreover, while Staaf testified that the thefts were reported to the

police,[70] no police reports were offered into evidence.

Both Staaf and Person testified that with Metzger gone, Person "briefly" assumed

the property management functions.[71]  It is unclear how much time passed before Person stepped

in, or how long she remained in control.  Betsy Elliot, a property manager at 2M, testified that

Person was never involved with 2M or the management of the properties.[72]  On the other hand,

Person, Staaf, and Jenkins all similarly testified that Person returned the keys to 2M in February

2017, approximately six months later.[73]  Regardless, Jenkins eventually discovered that "a lot of

the properties were not rented," and that "most of the accounts were almost empty."[74]  It is

undisputed that DE-Pinnacle failed to make loan payments when due in June, July, and August

2016, causing Wilmington, through its servicer Midland Loan Services, to issue a notice of

default on August 11, 2016.[75]

---

[67]    Vol. 2 Trans. at 86:25, 87:1–6.

[68]    Vol. 2 Trans. at 87:7–18.

[69]    Vol. 1 Trans. at 186:24–25, 187:1–2.

[70]    Vol. 1 Trans. at 187:2–3.

[71]    Vol. 2 Trans. at 39:15–25, 40:1–8 (Person admits collecting the rents when "we took over management for probably a month" in June or July); see also Vol. 1 Trans. at 165:13–22 (Staaf testified that "after Julian and Michelle were involved, they dropped the rent..." on the property located at 724 11th Avenue in New Brighton).

[72]    Vol. 2 Trans. at 106:3–15.

[73]    Vol. 1 Trans. at 177:3–6; Vol. 2 Trans. at 43:3–5, 72:9–18.

[74]    Vol. 2 Trans. 87:19–24.

[75]    Vol. 1 Trans. at 66:8–13; Ex. 20.  In addition to the payment defaults, DE-Pinnacle also failed to provide updated financial information required by the lender.  Vol. 1 Trans. at 67.

Upon Staaf's release from prison in October 2016, he "learned that [his] mother did not own Pinnacle," which came as a surprise as he "was under the assumption that she did because she was supposed to be refinancing."[76]  He further testified that he did not know anything about the property transfers that occurred while he was incarcerated,[77] which is difficult to reconcile with his prior testimony regarding his attempt to stop Jenkins from effectuating them.[78]  Staaf "immediately" called Person to find out "what's going on," and how she obtained the properties.[79]  He testified that she did not explain how or why she came into control of the properties, but nonetheless promptly agreed to return the properties to Jenkins.[80]

Despite Staaf's concern, and Person's alleged instant concession, the parties took no action to accomplish the re-conveyance for several months.    In the interim, Person communicated with Angela Gonzales, a Senior Asset Manager for Midland, seeking to restructure the loan outside of bankruptcy to cure the default.[81]  Neither Jenkins nor Staaf had any direct contact with Midland,[82] but both knew that Person was talking to Gonzales.[83] Person's attempted negotiation proved unsuccessful, and by November 2016, Wilmington

---

[76]    Vol. 2 Trans. at 23:14–19; see also id. at 17:10–15 (Staaf testifying that Jenkins informed him that Person was in control of DE-Pinnacle).

[77]    Vol. 1 Trans. at 18:14–24.

[78]    It is possible, though far from clear, that Staaf may have meant that he was simply unaware of the details of the property transfers until he reviewed the relevant documents, rather than being completely oblivious to the fact that they took place.  On the other hand, any knowledge of the transfers is tough to harmonize with Staaf's astonishment that Jenkins did not own DE-Pinnacle.

[79]    Vol. 2 Trans. at 23:19–22.

[80]    Vol. 2 Trans. at 23:23–25, 24:1–15.

[81]    Vol. 2 Trans. at 58:29–25, 59:1–22; see Vol. 1 Trans. at 69:12–14.

[82]    Vol. 1 Trans. at 71:12–15; Vol. 2 Trans. at 15:1–13, 18:12–13, 60:9–18.

[83]    Vol. 2 Trans. at 71:4–6.

11

commenced mortgage foreclosure actions against all of the pledged properties.[84]  The pleadings

were served on Person in Ohio.[85]

On February 21, 2017, Person attempted to transfer 99% of her membership

interests in DE-Pinnacle to Fenix Capital, LLC,[86] an entity controlled by Jenkins.[87]

Nevertheless, the assignment was defective because it purports to transfer membership units in

"Pinnacle Land Group, LLC, a Pennsylvania limited liability company[.]"[88]  Staaf was involved

in the preparation of the document and testified that it mistakenly references a Pennsylvania

limited liability company because he assumed, based on the location of the properties, that DE-

Pinnacle was formed there.[89]  Person testified that she executed the document because her intent

always was to return the properties to Jenkins, and it made sense to do so given that the day-to-

day operations were being handled by 2M.[90]  She did not notify Gonzales of the purported

transfer.[91]

Two days later, Pinnacle entered into an agreement with 2M to manage the

properties for a 5% fee over the course of a three-year term beginning on March 1, 2017.[92]  The

agreement makes no reference to any prior arrangement between the parties, despite the

representation that 2M was managing the properties since the inception of the loan in 2015.[93]

---

[84]     Exs. 21, 23.

[85]     Exs. 22, 24.

[86]     Ex. A; Vol. 1 Trans. 41:5–24, 42:21–24

[87]     Vol. 2 Trans at 65:8–9.

[88]     Ex. A.

[89]     Vol. 1 Trans. at 190–91; Vol. 2 Trans. at 16:17–25, 17:1.

[90]     Vol. 2 Trans. at 56:13–19, 57:6–13.

[91]     Vol. 2 Trans. at 61:1-13.

[92]     Ex. O.

[93]     Ex. O; see also Exs. 17 and N. The agreement does not specify whether it pertains to DE-Pinnacle or PA-
Pinnacle, but it was executed by Jenkins as "managing member."

Staaf subsequently returned to work at 2M and focused on renovating and re-leasing the properties, many of which had fallen into disrepair.[94]

In the absence of any regular payments, Wilmington continued to pursue its remedies in the state court and eventually obtained orders appointing a receiver for its collateral in August 2017.[95]

**B.    Procedural History**

On August 18, 2017, before the receiver could take possession, "Pinnacle" commenced this bankruptcy case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code.[96]  Pinnacle's petition was executed by Joann Jenkins as "manager."[97]  On the *Statement of Financial Affairs*, Jenkins indicated that she was the managing member of Pinnacle and personally held 100% of its equity interests.[98]  The petition lists DE-Pinnacle's employer identification number.[99]  On *Schedule A/B*, Pinnacle identified the eight properties held by DE-Pinnacle.[100]  *Schedule D* reflects that the scheduled properties are encumbered by a lien held by Midland.[101]

---

[94]    Vol. 2 Trans. at 12:2–6.

[95]    Exs. 25, 26.

[96]    Unless expressly stated otherwise, all references to "Bankruptcy Code" or to specific sections shall be to the Bankruptcy Reform Act of 1978, as amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), Pub. L. No. 109-8, 119 Stat. 23, 11 U.S.C. § 101, *et seq.* All references to "Bankruptcy Rule" shall be to the Federal Rules of Bankruptcy Procedure.

[97]    Dkt. No. 1.

[98]    Dkt. No. 22.

[99]    Dkt. No. 1.

[100]    Dkt. No. 22.

[101]    Id.

Wilmington was initially confused by the bankruptcy because it was initiated by a person not known to be a member of Pinnacle with no connection to the loan.[102] Ultimately, it filed motions seeking dismissal or, alternatively, stay relief, alleging a litany of complaints ranging from the unauthorized transfer of DE-Pinnacle's membership to substantial payment defaults. Wilmington's theory of the case has been understandably fluid, particularly as new facts emerged. Its primary argument is that PA-Pinnacle is the actual debtor because Jenkins never received an assignment of the equity interests in DE-Pinnacle. As PA-Pinnacle does not hold title to any assets, Wilmington posits that it cannot pursue bankruptcy relief. Conversely, if DE-Pinnacle is the debtor, Wilmington contends that the petition is flawed because Jenkins lacked the requisite corporate authority to initiate the case. Wilmington also urges the Court to dismiss this case to prevent "use of the Bankruptcy Courts to validate a fraud."[103]

Pinnacle opposes the relief sought by Wilmington, contending that Jenkins is a victim of the "unscrupulous business tactics" of Metzger, Hickman, and Person.[104] Moreover, Pinnacle asserts that it has the capacity to confirm a feasible plan and that Jenkins, as the original owner, is better suited to manage the properties than Person. As evidence, Pinnacle filed a plan of reorganization in March 2018 which would significantly modify Wilmington's claim. The plan proposes a reduced loan balance (based on an anticipated cram down to $600,000), reduced monthly payments (based on 30-year amortization), and a reduced interest rate of 5% (from a contract rate of 7.338%).[105] If confirmed, the plan would cancel all existing equity interests (including those held by Person) and split ownership of the reorganized debtor between Staaf and

---

[102]    Vol. 1 Trans. at 70:19–25, 71:1–15.

[103]    Dkt. No. 176 at 16.

[104]    Dkt. No. 73 at ¶ 9.

[105]    Dkt. No. 136 at § 6.2.

Jenkins through their affiliated entities.[106]  Jenkins will also become a guarantor of the modified

Wilmington debt.[107]    The plan acknowledges that Pinnacle has no creditors other than

Wilmington and various real estate taxing authorities.[108]

       After several preliminary hearings, the Court conducted a two-day evidentiary

hearing.  Fifty-two exhibits were admitted into evidence, and seven witnesses testified: Staaf,

Person, Jenkins, Gonzales, Elliot, Andrew Hurd,[109] and Michael Wilson.[110]  Hickman was

identified as a witness by Pinnacle and was present on the second day of the evidentiary hearing,

but ultimately was not called to testify.[111]  At the conclusion of the second day, the Court took

the matters under advisement.    In lieu of closing arguments, the parties filed post-trial

memoranda.[112] Wilmington's motions are now ripe for adjudication.

## II.    __JURISDICTION__

       This Court has authority to exercise jurisdiction over the subject matter and the

parties pursuant to 28 U.S.C. §§ 157(a), 1334, and the Order of Reference entered by the United

States District Court for the Western District of Pennsylvania on October 16, 1984.  This is a

core proceeding under 28 U.S.C. § 157(b)(A) and (G).  The parties consent to the entry of final

---

[106]     Dkt. No. 136 at § 6.4.

[107]     Id.

[108]     Dkt. No. 136.

[109]     Hurd is a Vice President of Credit at Finance of America Commercial, but was previously employed at
B2R at the time DE-Pinnacle obtained the loan.

[110]     Wilson is the accountant for Pinnacle and Jenkins.  The primary thrust of his testimony is that he included
income from Pinnacle on Jenkins' 2016 and 2017 tax returns.

[111]     Vol. 2 Trans. at 98–99, 110.

[112]     Dkt. Nos. 176–77.

orders with respect to the matters now before the Court.[113]   Venue is proper under 28 U.S.C. §

1409.

## III.   DISCUSSION

### A.   Identity of the Debtor

As a preliminary matter, the unusual facts of this case coupled with Wilmington's

assertions compel the Court to first answer an extraordinary question—which entity is the

debtor?  Wilmington argues that because there was no effective transfer of Person's interest in

DE-Pinnacle to Jenkins, who initiated the above-captioned case, the debtor cannot be DE-

Pinnacle.  Instead, based on the purported transfer of Person's interest in a Pennsylvania limited

liability company to Jenkins, Wilmington concludes that PA-Pinnacle must be the debtor.  The

Court disagrees.

Putting aside the intent of the parties for a moment, the record establishes that

Jenkins possessed no cognizable interest in DE-Pinnacle on the petition date.  Ironically, the

evidence also indicates that Person never had an interest in PA-Pinnacle, meaning that Jenkins

could not claim ownership of that company either.  As a result, Jenkins lacked the requisite

authority to file a bankruptcy petition on behalf of either DE-Pinnacle or PA-Pinnacle on the

petition date.  *Authority* to file, however, is not the same as *ability* to file.  An unauthorized

petition may be subject to dismissal, but that does not alter the identity of the purported debtor in

the interim.

In the Court's view, there is no real question that Pinnacle, the debtor in

possession, is DE-Pinnacle.  All information appearing in the bankruptcy petition and schedules

---

[113]      Vol. 1 Trans. at 10:8–17; Dkt. No. 133 at ¶ 3.

pertain solely to DE-Pinnacle. Indeed, the unique employer identification number reflected on

the petition belongs to DE-Pinnacle, and the schedules inventory its real property, as well as

catalogue its debts. Wilmington's contention that PA-Pinnacle misappropriated this information

is strained and circular. Nothing in the record points to PA-Pinnacle which, as far as anyone

knows, never operated and has no assets. Moreover, the record amply establishes that Person

intended to convey her interest in DE-Pinnacle to Jenkins, and that the defect in the transfer

document was a scrivener's error. In sum, the record evinces a clear intent to seek bankruptcy

relief on behalf of DE-Pinnacle.

Having confirmed that DE-Pinnacle is the debtor in possession, which will now

be referred to solely as "Pinnacle," the Court must consider whether dismissal of the case is

appropriate.

### B.   Dismissal under Section 1112(b)

Under section 1112(b) of the Bankruptcy Code, a court shall, upon a finding of

cause, dismiss a chapter 11 case or convert it to one under chapter 7, depending on whichever is

in the best interests of creditors and the estate.[114] Thus, this section "requires a two-step process

in which the court first determines whether there is 'cause' to convert or dismiss, and next

chooses between conversion and dismissal based on 'the best interest of creditors and the

estate.'"[115]

"Cause" is not defined, but section 1112(b)(4) provides a non-exclusive list of

circumstances that would justify cause for dismissal or conversion to help guide the court in its

---

[114]    11 U.S.C. § 1112(b)(1).

[115]    In re Am. Capital Equip., LLC, 688 F.3d 145, 161 (3d Cir. 2012) (quoting 11 U.S.C. § 1112(b)).

assessment.[116]  Because the list is not exhaustive, "the court may consider other factors as they arise and use its powers to reach appropriate results in individual cases."[117]  Among those additional factors, most courts agree that a case may be dismissed for cause under section 1112(b) when the filing party lacks corporate authority to commence a bankruptcy case.[118]  The United States Court of Appeals for the Third Circuit has also identified bad faith as cause warranting dismissal of a chapter 11 petition.[119]

The court may not, however, convert or dismiss the case if unusual circumstances establish that dismissal or conversion would not be in the best interests of the estate and creditors.[120]  "A determination of unusual circumstances is fact intensive and contemplates facts that are not common to Chapter 11 cases."[121]  Additionally, the unusual circumstances exception only applies if: (1) there is a reasonable likelihood that a plan will be confirmed within a reasonable time; (2) the cause for dismissal or conversion is something other than a continuing loss or diminution of the estate with no reasonable likelihood of rehabilitation; and (3) there is a reasonable justification for the act or omission giving rise to the cause of dismissal or conversion that will be cured within a reasonable time.[122]

---

[116]    11 U.S.C. § 1112(b)(4).

[117]    In re Gonic Realty Tr., 909 F.2d 624, 626 (1st Cir. 1990) (citing In re Smith, 77 B.R. 496, 500 (Bankr. E.D. Pa. 1987)).

[118]    See e.g., Price v. Gurney, 324 U.S. 100, 106 (1945) ("If the District Court finds that those who purport to act on behalf of the corporation have not been granted authority by local law to institute the proceedings, it has no alternative but to dismiss the petition."); see also In re ComScape Telecomms., Inc., 423 B.R. 816, 829 (Bankr. S.D. Ohio 2010) (concluding that an unauthorized bankruptcy petition is so fundamentally flawed that a court must inherently dismiss it, irrespective of any considerations under section 1112(b)).

[119]    See In re SGL Carbon Corp., 200 F.3d 154, 160 (3d Cir. 1999).

[120]    11 U.S.C. § 1112(b)(2).

[121]    In re Costa Bonita Beach Resort, Inc., 513 B.R. 184, 195 (Bankr. D.P.R. 2014).

[122]    Nester v. Gateway Access Sols., Inc. (In re Gateway Access Sols., Inc.), 374 B.R. 556, 561 (Bankr. M.D. Pa. 2007).

The moving party bears the initial burden of establishing cause for dismissal or conversion by a preponderance of the evidence.[123]   Once cause is found, the burden shifts to the debtor to identify unusual circumstances warranting a denial of the requested relief.[124]

  1.   Authority to File

As previously stated, Jenkins, without any cognizable interest in Pinnacle on the petition date, lacked the requisite corporate authority to file the petition commencing this case. Although dismissal is justified under these circumstances, it can be averted if the defective corporate authorization is subsequently ratified in accordance with applicable law.[125]   Because Pinnacle was formed in Delaware, and in the absence of any other controlling provision within its operating agreement, Delaware law will determine whether a valid ratification occurred.[126]

Delaware law recognizes that previously unauthorized actions can be validated by ratification.[127]   Ratification can occur by express action or by implication.[128]   It "may be found from conduct 'which can be rationally explained *only* if there were an election to treat a supposedly unauthorized act as in fact authorized.'"[129]   Implicit ratification exists when an agent

---

[123]    Anderson v. Commonwealth Renewable Energy, Inc. (In re Commonwealth Renewable Energy, Inc.), 550 B.R. 279, 283 (Bankr. W.D. Pa. 2016).

[124]    In re Am. Capital Equip., LLC, 688 F.3d 145, 161 (3d Cir. 2012).

[125]    See In re E. Supply Co., 267 F.2d 776 (3d Cir. 1959); see also Hager v. Gibson, 108 F.3d 35, 39-40 (4th Cir. 1997) (examining whether an unauthorized bankruptcy petition might be ratified under Virginia law by the ensuing conduct of persons possessing the requisite authority); In re ORFA Corp. of Am. (Del.), 115 B.R. 799 (Bankr. E.D. Pa. 1990) (recognizing that chapter 11 debtor could avert dismissal of an unauthorized petition by the subsequent ratification of the petition by the debtor's properly constituted board); In re Be-Fit Health & Racquet, Inc., No. 90-11254S, 1997 WL 34726325 (Bankr. E.D. Pa. Nov. 4, 1997) (acknowledging that ratification of a previously-filed bankruptcy petition is authorized under Pennsylvania law).

[126]    See DEL. CODE ANN. tit. 6, § 18-111 (2018).

[127]    See Gantler v. Stephens, 965 A.2d 695, 713 (Del. 2009); Hannigan v. Italo Petroleum Corp. of America, 47 A.2d 169, 171 (Del. 1945).

[128]    Genger v. TR Inv'rs, LLC, 26 A.3d 180, 195 (Del. 2011).

[129]    Id. (quoting Dannley v. Murray, No. CIV.A. 5383, 1980 WL 268061, at *4 (Del.Ch. July 3, 1980)) (emphasis in original).

clothed with actual authority manifests assent to the action or engages in conduct that justifies a reasonable assumption of consent.[130] Generally, a ratification 'relates back' in time to the date of the original action, thereby eradicating any defect as to its efficacy.[131] Nevertheless, a ratification is ineffective after the passage of a deadline or when the rights of others have intervened and such rights may be impaired by the ratification.[132] The burden of establishing ratification falls on the party asserting it.[133]

In the present case, Person was the only individual who could authorize the bankruptcy filing. While Pinnacle failed to produce a written ratification of the petition, Person, though fully aware of the pending bankruptcy, has taken no action to oppose it. To the contrary, she appeared before this Court in support of Pinnacle's opposition to the *Motion to Dismiss*, contending that she no longer has an ownership interest in Pinnacle.[134] Upon this record, the Court concludes that while Jenkins' attempt to seek bankruptcy relief on behalf of Pinnacle was initially defective, the filing is now validated, *nunc pro tunc*, by Person's acquiescence.[135] Accordingly, the initial unauthorized commencement of this case is not cause for dismissal.

---

[130]   See RESTATEMENT (THIRD) OF AGENCY § 4.01(1), (2) (AM. LAW INST. 2006) ("A person ratifies an act by (a) manifesting assent that the act shall affect the person's legal relations, or (b) conduct that justifies a reasonable assumption that the person so consents.").

[131]   Michelson v. Duncan, 407 A.2d 211, 219 (Del. 1979) ("a validly accomplished shareholder ratification relates back to cure otherwise unauthorized acts of officers or directors"); In re E. Supply Co., 267 F.2d 776, 778 (3d Cir. 1959) ("[t]he general rule [is] that the ratification of an act purported to be done for a principal by an agent is treated as effective at the time the act was done. In other words, ... the ratification 'relates back' in time to the date of the act by an agent.").

[132]   In re W.R. Grace & Co., 366 B.R. 302 (Bankr. D. Del. 2007) (once the claims bar date had expired, claimants could not ratify law firm's act of submitting unauthorized proofs of claim on their behalf).

[133]   Yiannatsis v. Stephanis, 653 A.2d 275, 280 (Del. 1995).

[134]   Vol. 2 Trans. at 44–45. While the Court recognizes that Person's appearance at the evidentiary hearing was obtained by a subpoena, it also afforded her an opportunity, if not an incentive, to express her disapproval of the bankruptcy.

[135]   Prior to the evidentiary hearing, the Court entered an order barring the introduction of any further evidence "as to the ownership/control of the Debtor and Fenix Capital . . . to the extent such information was not previously disclosed" at that time (the "Bar Order"). Dkt. No. 108. Without recounting the entire laborious

## 2.    Bad Faith

A chapter 11 case must be pursued in good faith.[136]    Bankruptcy relief is a privilege available to those who pursue it with sincere intentions and possess a willingness to comply with its many obligations.[137]    When a bankruptcy petition is filed in bad faith, cause exists to dismiss the case.[138]    The debtor bears the burden of establishing that its petition was commenced in good faith.[139]

Good faith is not simply a question of subjective intent.[140]    Instead, an examination into the debtor's good faith is a "fact-intensive, case-by-case inquiry" that must objectively consider the "totality of the circumstances."[141]    There is no clear-cut standard to be applied, but some courts have compiled a list of factors that may be relevant to the analysis.[142]

---

history of the order, suffice it to say that Pinnacle, in the face of multiple orders, repeatedly provided erroneous and inconsistent information regarding its ownership, as exemplified by the submission of the patently defective transfer document.  Despite Pinnacle's vehement objections, the Court entered the Bar Order to prevent a trial by ambush at the evidentiary hearing.  In the end, however, the Court's finding that the petition was subsequently ratified, if not initially authorized, renders the exclusion of Pinnacle's *post facto* efforts to establish Jenkins' ownership non-prejudicial.

[136]    In re SGL Carbon Corp., 200 F.3d 154, 160 (3d Cir. 1999).

[137]    See NMSBPCSLDHB, L.P. v. Integrated Telecom Express, Inc. (In re Integrated Telecom Express, Inc.), 384 F.3d 108, 118 (3d Cir. 2004) ("At its most fundamental level, the good faith requirement ensures that the Bankruptcy Code's careful balancing of interests is not undermined by petitioners whose aims are antithetical to the basic purposes of bankruptcy."); Little Creek Dev. Co. v. Commonwealth Mortg. Corp. (In re Little Creek Dev. Co.), 779 F.2d 1068, 1072 (5th Cir. 1986) ("[A] good faith standard protects the jurisdictional integrity of the bankruptcy courts by rendering their equitable weapons . . . available only to those debtors and creditors with 'clean hands.'").

[138]    Appellees in 09-1432 v. BEPCO, L.P. (In re 15375 Mem'l Corp.), 589 F.3d 605, 618 (3d Cir. 2009); In re Integrated Telecom Express, Inc., 384 F.3d at 118; In re SGL Carbon Corp., 200 F.3d at 162.

[139]    In re 15375 Mem'l Corp., 589 F.3d at 618; In re SGL Carbon Corp., 200 F.3d at 162 n. 10.

[140]    In re 15375 Mem'l Corp., 589 F.3d at 618 n.8; Marsch v. Marsch (In re Marsch), 36 F.3d 825, 828 (9th Cir. 1994).

[141]    Solow v. PPI Enters. (U.S.), Inc. (In re PPI Enters. (U.S.), Inc.), 324 F.3d 197, 212 (3d Cir. 2003); see In re Integrated Telecom Express, Inc., 384 F.3d at 118; In re SGL Carbon Corp., 200 F.3d at 162.

[142]    In U.S. Tr. v. Stone Fox Capital LLC (In re Stone Fox Capital LLC), the bankruptcy court observed that while there is no exhaustive list of factors that may be relevant, courts have considered whether:

The Third Circuit, however, has typically focused on two fundamental inquiries: (1) whether the

petition serves a valid reorganizational purpose; and (2) whether the petition is filed merely to

obtain a tactical litigation advantage."[143]

Here, an objective view of the record demonstrates a concerted effort to effectuate

a bait and switch on the lender. Jenkins needed the B2R loan to satisfy delinquent taxes as well

as a balloon payment that was about to come due on a prior obligation. Rather than pursue her

own financing, Jenkins consented to the transfer of the properties to Person's affiliates.[144]

Person then obtained the loan while holding herself out to be the owner and guarantor of

Pinnacle. B2R was also misled into believing that Person owned 2M and that Staaf, the actual

owner, was merely a Realtor.[145] The parties agreed that once the loan was funded, the properties

---

(1) the case is a single asset case; (2) there are few unsecured creditors; (3) there are no
ongoing business operations or employees; (4) the petition was filed on eve of
foreclosure; (5) the case is a two party dispute which can be resolved in pending state
court action; (6) there is no cash or income; (7) there is no pressure from non-moving
creditors; (8) the debtor has filed previous bankruptcy petitions; (9) the debtor's
prepetition conduct was improper; (10) there is no possibility of a reorganization; (11) the
debtor was formed immediately prepetition; (12) the debtor filed solely for the automatic
stay; and (13) the subjective intent of the debtor.

572 B.R. 582, 589 (Bankr. W.D. Pa. 2017) (citing Primestone Inv. Partners, L.P. v. Vornado PS, LLC (In re
Primestone Inv. Partners, L.P.), 272 B.R. 554, 557 (D. Del. 2002) and In re JER/Jameson Mezz Borrower
II, LLC, 461 B.R. 293, 299 (Bankr. D. Del. 2011)).

[143]    NMSBPCSLDHB, L.P. v. Integrated Telecom Express, Inc. (In re Integrated Telecom Express, Inc.), 384
F.3d 108, 119–20 (3d Cir. 2004); In re SGL Carbon Corp., 200 F.3d 154, 160 (3d Cir. 1999). See also
United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd. (In re Timbers of Inwood Forest
Assocs., Ltd.), 808 F.2d 363, 373 (5th Cir. 1987) (stating that if chapter 11 plan does not have a
rehabilitative purpose, the "statutory provisions designed to accomplish the reorganization objective
become destructive of the legitimate rights and interests of creditors, the intended beneficiaries").

[144]    Although Jenkins suggests that some of the deeds were executed by individuals lacking the requisite
corporate authority to act on behalf of the grantor, the transfers were nonetheless consistent with her
understanding of the transaction. See Vol. 2 Trans. at 83–84 (acknowledging that she and her husband,
Joseph Jenkins, both signed the deed transferring the 346 Hart Drive property to Person's control).

[145]    Ex. 17 at WT 0237-0239 ("The property management company, which is 100% owned by the Guarantor,
has over 12 years of experience and currently manages 76 properties.").

would be returned to Jenkins. Indeed, both Jenkins and Person acknowledged that this was the plan from the very beginning.[146]

Thus, by their own admission, the parties were knowingly complicit in a scheme to conceal the involvement of Jenkins and Staaf from B2R and its underwriters for the purpose of obtaining financing that the Court infers was not otherwise available. Now in bankruptcy, Pinnacle attempts to further that scheme by seeking the Court's imprimatur of a plan of reorganization that effectively consummates the fraud by substantially improving the position of Staaf and Jenkins at the expense of Wilmington. Specifically, the plan proposes to: (1) reduce the loan balance through a cram down; (2) reduce the monthly payments by re-amortizing the loan over a 30-year period; (3) reduce the interest rate from 7.338% to 5%; (4) vest title to the financed properties in the reorganized debtor;[147] and most significantly, (5) cancel all existing equity interests (Person) and divide the ownership of Pinnacle between Fenix (Jenkins) and 2M (Staaf). In other words, Staaf and Jenkins will end up with the properties and an even better loan than Person was able to induce B2R into extending, while Wilmington loses the full economic value of its claim and is essentially forced to accept borrowers not of its choosing, one of which is a convicted felon. Adding insult to injury, the plan does not explain how the remaining balance of Wilmington's claim will be satisfied when the balloon payment comes due in the sixty-first month after the effective date. Notably, Pinnacle has no creditors other than Wilmington and the various real estate taxing authorities.

---

[146] Vol. 2 Trans. at 44:1–3, 49:8–10, 50:24–51:1, 51:11–14, 53:25–54:2, 56:16–18 (PERSON: "my intentions were always to turn the properties back over to Pinnacle Land Group"); 86:11-13 (JENKINS: "I knew that we turned [the properties] over, but I was—thought that we were getting them back because that was my understanding at the beginning."), 91.

[147] The plan's title vesting provision is undoubtedly meant to address the fact that Pinnacle's counsel has questioned the validity of several of the transfers from Jenkins' affiliates on the basis that the conveying deeds were seemingly not executed by an authorized agent of those entities.

Pinnacle attempts to refute the appearance of impropriety by portraying Jenkins as a victim who was bamboozled by the triumvirate of Metzger, Hickman, and Person. As Staaf and Jenkins would have it, Pinnacle, now under their control, is merely trying to rehabilitate itself after the financial distress caused by Metzger. Of course, this theory is difficult, if not impossible, to reconcile with the proposed plan of reorganization that patently advances the illicit machinations. Regardless, the Court finds this narrative otherwise incredible and wholly unsupported by the evidence for a plethora of reasons.

The first problem is that Pinnacle does not offer any alternative explanation for the questionable structure of the refinancing other than to lay the blame with Metzger and Hickman. The undisputed evidence is that Hickman designed the transaction and prepared the documentation, though Staaf and Person provided conflicting testimony regarding how he became involved in the first place. Hickman would have been the most knowledgeable person on these subjects, but Pinnacle released him from a subpoena without calling him to testify even though he was present for the evidentiary hearing. Instead, Staff, Jenkins, and Person all testified that they did not know why Person, rather than Jenkins and her affiliates, obtained the loan. This testimony is implausible, and the Court finds it particularly inconceivable that Person would agree to be personally liable for a half million dollar obligation without knowing the purpose of her involvement. Yet even assuming, *arguendo*, that these witnesses are to be believed, their testimony—that they know virtually nothing about the transaction—fails to provide any additional context to mitigate the damning impression painted by the uncontested facts.

Pinnacle's insistence that the "uncontroverted testimony at trial is that Mrs. Jenkins would never had [sic] agreed to convey ownership and control of the properties to Mr.

Metzger, Mr. Hickman, and/or Ms. Person" is simply baffling. Jenkins did, in fact, knowingly transfer the properties to further the ploy to obtain the financing she required.[148] The implication that Jenkins only did so because she was deceived by her trusted manager appears to be nothing more than a contrived justification for how she remains innocent despite her involvement in a fraud on the lender. The claim of victimization also fails to account for the involvement of Amy Staaf, who conveyed three of the eight properties Pinnacle now holds. The record is devoid of any explanation as to why she did so, or how she too could have been duped by Metzger.

In the end, attempts to blame Metzger fall flat. To begin, it is unclear what misconduct, if any, he may have committed. Though Jenkins complained of "hanky panky" with the business, particularly involving the movement of funds between bank accounts, her testimony stopped short of accusing him of theft.[149] Moreover, Pinnacle did not offer any bank statements, which could have been readily obtained from the financial institutions themselves, showing an inappropriate diversion of funds. Similarly, there is no proof that Metzger, or anyone else for that matter, schemed to deprive Jenkins of any property. To the contrary, each of the parcels originally transferred to Person's entities have since been returned to her control in accordance with Jenkins' original understanding. As for the missing records, Staaf confesses that he is unaware of who might be responsible for their disappearance.[150] Finally, with respect to the assertion that Metzger was destroying the business, the evidence is that the loan was current until June 8, 2016, suggesting that the defaults did not occur under Metzger's watch. At

---

[148]    Dkt. No. 177 at 4.

[149]    This is in contrast to prior statements by Pinnacle's counsel indicating that "[w]e've uncovered what we believe [to be] serious thefts by the manager." Audio Recording of Hearing Held in Courtroom A, January 4, 2018 at 10:40.40 a.m.

[150]    Assuming the records did, in fact, disappear. As noted above, Pinnacle did not offer any police reports to prove the burglaries occurred. The Court only has the word of Staaf and Jenkins, both of whom are less than credible.

best, there appears to be a temporal correlation between Metzger's absence and Pinnacle's financial distress, not a causal relationship arising from any proven act or omission on his part.

As to the other two members of the alleged conspiracy, Pinnacle is inconsistent in its characterization of Hickman and Person as bad actors. If Hickman helped orchestrate the scheme to steal the properties from Jenkins, why would Pinnacle not try to elicit testimony to that effect? If Person had a similar diabolical intent, why would she, as Staaf testified, immediately agree to return the properties and transfer her interest in Pinnacle on request? More importantly, why would Staaf wait several months to prepare the transfer documents necessary to regain control over the properties if he truly believed his mother was conned by these individuals? In the same vein, why would he then allow the purported thief to keep 1% of the membership units of Pinnacle?

Staaf's testimony is riddled with inconsistencies and is largely incredible. To start, he offered conflicting accounts of how and when he discovered that Jenkins had transferred the properties. On the first day of the evidentiary hearing, Staaf testified that while he was in prison, Jenkins informed him that the refinancing involved property transfers, prompting him to tell her to "stop," and call Metzger in protest. In contrast, he testified on the second day that he learned Jenkins did not own Pinnacle when he returned from prison. Ultimately, neither of these stories is credible. It is particularly notable that Jenkins did not corroborate his warning, and Pinnacle's counsel did not attempt to elicit such testimony from her. Why would Jenkins, in the face of such a dire warning from her son, move forward with the transfers on the word of a convicted felon she did not previously know? This is especially astonishing considering that Jenkins hired Metzger on Staaf's recommendation. The Court concludes that the most likely

explanation is that there was no warning.[151]  Similarly, as the Court previously observed, Staaf's

four-month delay in seeking the transfer of Pinnacle is incompatible with the belief that Person

stole the properties from Jenkins.[152]

The natural conclusion drawn from this record is that Staaf has always been the

guiding force behind Pinnacle, and that Hickman and Person were his accomplices.  The

existence of a partnership is consistent with the fact that Staaf intended Person to retain a 1%

interest in Pinnacle.  Viewed in this light, the Court reasons that Staaf did not insist on the

immediate transfer of Pinnacle in order to maintain the illusion of Person's control during her

negotiations with Midland.  Jenkins, whose knowledge of her businesses was minimal, is almost

certainly a mere straw for Staaf.  His testimony displayed a mastery of the subject properties

with an ability to recall minute details on various rental units.[153]  In comparison, Jenkins could

not credibly ascertain her interest in the holding companies she allegedly controls, let alone

specify the properties each one owns.[154]  Moreover, despite their protests, Staaf and Jenkins

greatly benefitted from the refinancing transaction.  Delinquent real estate tax obligations and a

maturing mortgage loan were satisfied from the loan proceeds.  Staaf's prior real estate holdings,

which were spread among Jenkins' affiliates and his ex-wife, have now been consolidated in a

---

[151]    For the same reason, the Court does not find credible Staaf's assertion that Metzger "silenced" him by
falsely reporting to the prison that Staaf used an unauthorized cell phone.

[152]    The Court also notes that the testimony is ambiguous as to when Staaf regained managerial control of the
properties to the extent that Person did not turn over the keys to 2M until February 2017.  If Person
maintained full control of the properties, effectively usurping 2M, the delay renders Staaf's story even less
plausible unless they were working together.

[153]    See generally Vol. 1 Trans. at 148–73.

[154]    On three occasions, Jenkins testified that she alone owned Melmic (through Fenix), but when pressed for
details as to how Amy Staaf acquired Melmic assets, she equivocated [while turning to look directly at
Staaf].  Vol. 2 Trans. at 65:10–25, 66:1–5, 84:17–19; 97:2–16.  Jenkins also struggled to recall the
circumstances by which Fenix acquired an interest in two other affiliates that owned part of the land
eventually transferred to Pinnacle.  Vol. 2 Trans. at 67 (discussing Pro Equity and EON Properties).

single entity which he effectively controls. Frankly, it strains credulity to contend that this result was not intended all along.

In sum, Pinnacle's bankruptcy does not serve a genuine reorganizational purpose. Rather, it is clear that Pinnacle seeks to use the bankruptcy to validate a fraudulent loan transaction and force the lender to accept controlling parties different from the one it vetted during the underwriting process. The Court cannot condone the use of the bankruptcy process to further such improper purposes, and therefore finds cause to dismiss the case.

### 3.    Best Interests of the Creditors and the Estate

Having determined that cause exists to dismiss the case under section 1112(b), the Court must still consider whether dismissal, as opposed to conversion to chapter 7, is in the best interests of creditors and the estate. Here, Wilmington is the only significant creditor in the case. Only four other claims were filed by the claims bar date. Three of those are secured claims that appear to enjoy statutory priority over Wilmington's mortgage,[155] while the remaining claim appears to be a claim against PA-Pinnacle.[156] Upon this record, the Court concludes that further bankruptcy proceedings would serve no beneficial purpose. Wilmington has already shown itself capable of pursuing remedies in state court, and the other creditors hold claims of a type that makes them indifferent as to whether this case is dismissed or converted. Accordingly, Pinnacle's case will be dismissed with prejudice.

---

[155]    See Claim Nos. 2-1 (City of Pittsburgh and School District of Pittsburgh); 3-1(Pittsburgh Water & Sewer Authority); and 4-1 (Borough of Ingram). Pinnacle identified additional taxing authorities on its bankruptcy schedules, but all of these claims are listed as disputed and would also be secured against the real property.

[156]    See Claim No. 1-1 (Pennsylvania Department of Revenue).

## IV.   CONCLUSION

In light of the foregoing, the Court will grant the *Motion to Dismiss*.  As a result,

the *Motion for Stay Relief* is moot.  This opinion constitutes the Court's findings of fact and

conclusions of law in accordance with Fed. R. Bankr. P. 7052.  The Court will issue a separate

order consistent with this opinion.

ENTERED at Pittsburgh, Pennsylvania.

GREGORY L. TADDONIO
UNITED STATES BANKRUPTCY JUDGE

Dated: September 10, 2018

Case administrator to mail to:
Debtor
Donald R. Calaiaro, Esq.
Gloria R. Buckley, Esq.